We'll hear argument in United States v. Cuevas-Reyes. Good morning, Diary and John Batiste on behalf of Mr. Appellant, Deja Cuevas-Reyes. I would like to reserve five minutes for rebuttal. Granted. Thank you. He's served a sentence, hasn't he? Yes. Yes. In a nutshell, this case is about a defendant who was convicted under AUSC 1324 for shielding and or harboring an illegal alien. Your Honors, basically at trial, the totality of the evidence was basically that my client, Mr. Deja Cuevas-Reyes, engaged in conduct that allowed four passengers to procure transportation outside of the United States. At the close of the government's case, there was a Rule 29 motion made, and at that time it was proffered to the court that there was absolutely no evidence of shielding or harboring illegal aliens and conduct that would tend to allow these aliens to remain in the United States. Where in the statute does it require that the conduct be such as to help the people remain in the United States? There's nothing in that statute that says you have to shield to remain in the United States. And that is correct. At trial, counsel was aware of other circuit courts, and at the time, we did make the argument that that was necessary. That was in the law in this circuit at the time, but we made the argument at that time. The court pointed to the fact that there was a number of courts that relied more so on where the charge was harboring, and in this case, the charge was more so shielding. That's what the trial court basically said. But at the close of the government's case and defense Rule 29 motion, the court basically pointed to the mere fact that there was some testimony that there was an effort to conceal that the passengers had paid money for transportation outside of the United States. But at that time, I maintain that, in fact, the evidence did not go to what the law required, which was shielding or to hide from attention. He didn't secrete them into the airport, right? They walked through in plain view, right? That's correct. That's correct. But he didn't tell them to go through customs. He told them to go directly to the airplane. He told them to go directly to the airplane. So he directed them how they should comport themselves in order to get to the airplane. But you acknowledge that in order to leave the United States, you have to go through customs. No. Well, I can't say that I acknowledge that because the practice was that there's two portions. He did not tell them to avoid going through customs. He directed them to the portion of the airport. In the north portion were only charter flights and plugup. That's correct. That's correct. He directed them where the plane would be. He did not tell them. He did not tell them, you know, go to the north portion of the airport where you avoid customs officials. And at this time, you know, I would like to point the court to, and this is an opinion that came up a few months later after the conviction in this case. This is where we have to be in this case, I think. The statute does not say that the defendant had to – tended to substantially facilitate remaining in the country illegally. But our case – all the cases in the other circuits predating this case said it, and we three months after this trial said it in Ossolick, and we said it even more clearly three months later in U.S. v. Sylvaeus. Whether it's harboring or whether it's shielding or whether it's whatever the other one is, you have to – the government has to prove that Sylvaeus' or here Cuevas-Reyes' conduct tended substantially to facilitate the four women remaining in the United States illegally and to prevent government authorities from detecting his unlawful presence. Okay. Tell me how. If I may, if I may, I look forward to getting into that. But even before we got this clarification from the Third Circuit, I think that we have to have some kind of evidence that showed concealment or shielding, and that was totally absent, and that was pointed up to the court on three different occasions, and the court pointed to the mere fact that there was some evidence of trying to hide it. Is the shielding telling him to come directly to the airport, the airplane, and not go through the airport facility and customs? Well, we have to be clear because the testimony was merely that they were directed at which portion of the airport they could catch the flight, and that was where the plane was at. And in Arsene, which came later, this court asked the question – we have found, or this court made the statement, we have found no cases in which a defendant has been convicted under 1324 for merely giving an alien advice to lay low and stay away from an address on file. And what I'm saying is that even if – the testimony I tried was basically that the defendants told him where they could catch the flight. They did not tell him affirmatively, you know, you can catch the flight and avoid custom detention or want to not run. But you acknowledge that if they would have gone the way – I'll say everyone goes to – gets to an airplane, leaving the country. If they would have gone through the regular and ordinary process, they would have gone through customs. Yes, if they have gone through the main terminal. Okay. And your client told them, or the people involved in the flight told them to come directly to the airplane. That's correct. Why is that shielding? Well, that is not shielding for the reasons exposed in Oselic, because he merely tells them where to come to the airport. I mean, where to catch the flight. This is basically – if it's a charter flight, this is general information, to use the court's words. General information available to anybody. If you're taking a charter flight, the charter flight leaves from the northern side of the airport. To convict under 1324, Oselic – as I read Oselic and Sylvaeus, the government has to prove conduct that tends substantially to facilitate the aliens remaining in the United States. And that's the polar opposite from what all the evidence indicates. He was substantially facilitating their departure. And that's our interpretation of what the statute requires. And that's what we say must be proved. Well, doesn't remaining also include remaining for that portion of time that you're actually departing? In other words, they were shielding them from detection. Certainly, if they went through customs, they would have been detected and arrested. Now, let me just ask you this question. Didn't they, in effect, shield them remaining during that portion of time that they were exiting from the country? Absolutely not, and this is why, because when they went to access that airplane and so forth, they walked – it wasn't broad daylight. This flight wasn't done in the middle of the night. They could have taken that flight at some other time. They took it high day. They walked to the airplane. They boarded that airplane. They did not do anything to secret themselves. They didn't do anything. It was done in open – it was done openly and notoriously. We understand, but don't you have to acknowledge on this record that these people told them to go directly to the airplane and that if they would have gone to the airport, they would have been detected? If certainly they went through customs, they would have been arrested. And they told them to go directly to the airplane, and for that portion of time, if remaining is required, they remained in this country while they were departing it. And he shielded them from being detected during that portion of time that they remained while they were departing. Okay, I can appreciate what the court is saying, but I would only say that if we look, which this court did, look at the amendment to the statute, the 1952 amendment and the congressional notes and whatnot, and if we go back, it really goes to really prevent illegal aliens from being in the United States. That's the public policy of it, to prevent that from happening. So initially, whereas it was only prescribing smaller people into the United States, when they later added shielding and harboring, this also went back to the initial prohibition to prohibit illegal aliens from basically being in the United States. And the whole purpose of the flight was to have them leave. There's no question. This case is a very unusual case in that I've never seen a case where – of this kind where the immigrant was trying to stay rather than trying to part, so that's very unusual. But the cases that we have cited to you all say remaining, but there's nothing in the statute that says – that makes it part of the offense, remaining. And to the extent that the cases they could say remaining, it's dictum. It's a bitter dictum. Well, I don't think so. I don't think so because I think it's a valid interpretation of the statute. It's a valid interpretation of the statute because here we have initially smuggling, smuggling. It prescribed smuggling into the United States, and when harboring and, I believe, shielding was added later, it was kind of ambiguous and whatnot. And ultimately, there was – I think there was a few cases and it was amended in 1952. And with the amendment, Congress made it clear that we wanted to prescribe – we wanted to prevent illegal aliens from staying in the United States. So I think it's a valid interpretation of the statute. I'm just wondering if what we're talking about here is dictum. Are three – are third-surgeon cases – No, no. – because they reverse – He's not an ally. They reverse both convictions for insufficient evidence of remaining. I took the honorable judge's comments. I thought that he was just engaging me in the discourse, but I don't think it's dictum. No, I don't think it's dictum. I do mean that to the extent that our case – I read them – that they say that they have to prove that the alien was remaining, that to that extent that those cases which require the remaining as part of the conviction are – it's dictum because all you have to do – you've read the statute probably ten times like I have. You just have to show shielding, harboring, and concealing. It has nothing to do with remaining in the statute, although I'll grant you I have never seen a case where there's been a prosecution when the alien was trying to remain rather than your client was trying to get out of town here. I mean these aliens are trying to get out. Where is your – just out of curiosity – where is your client now, and what is his status? How long did he serve? My client did ten months, not counting the additional time he may have been detained. I don't think by – he was detained perhaps by immigration. Subsequently, he served his ten months. He stayed in Puerto Rico for some time, but he's now in Santo Domingo. Does he have any status in the United States, any immigration status? I believe his papers were revoked, but – Because of this conviction? Yes, and although I don't represent him on the immigration aspect, I am in contact with him, and my intention is that if this court does what I believe the law requires, which is reverse his conviction, I'm going to advise him and, if I can, assist him in trying to get the immigration court to revisit. The airplane, I guess, was forfeited. I don't know if the act – I don't know if it happened. It's in the briefing, but it's not a disposition of it. There was a forfeiture. I think the government changed its mind with respect to seeking forfeiture because there was an issue with respect to whether or not there was an initial – I can't recall exactly because it was in my client's briefing. Thank you. Thank you. We'll get you one rebuttal. Mr. Myers, you go back about 30 years and you don't remember me, I'm sure. See, I told you you wouldn't. She's an old lady now. You know, she was young and beautiful. She's still beautiful, but she's old. Excuse me, Your Honor, you made me talk about my father. Oh, I'm talking about your father! Oh, I'm so sorry. My eyes are so bad. It does say Ishmael Myers, Jr. Well, that's right, because I go way back with your father. Please give him my best regards. Yes, Your Honor. And I apologize. Oh, actually, you should be flattered because your father didn't wonder who the man was. Thank you, Your Honor. May it please the Court. As Your Honor stated, the Third Circuit ruled in Osgoode that a fourth element was required in order to prove the shielding. However, at the time of trial, the District Court followed the Eleventh Circuit, which only required the three elements. As a result of Oslick, the fourth element is that the defendants substantially facilitate the aliens remaining in the United States. And you agree that the government has to prove that? According to Oslick, yes, the government has to prove that. And we believe that there is substantial evidence on the record to prove that the defendant did exactly that. All right, let's see what it is. What is the evidence that the defendant intended to substantially facilitate the aliens remaining in the United States when the plane was bound for the Dominican Republic and there was no evidence that passengers intended to return to the U.S.? Ms. Pantil-Santiago said her travel was one way. Ms. Novas-Apata told the defendant she wanted to move to Santo Domingo. What is there that would say he substantially facilitated their remaining in the United States as opposed to their getting out? Well, Your Honor, I believe if you look at page 220 of the record, Ms. Novas-Apata stated that she was married. Number one, she arrived in the United States in 1999. Number two, she's married to a United States citizen, which is on 220 of the record. They're all illegal. Yes, and number three, she had a pending visa application in which she needed to go back to Santo Domingo in order to complete, which is on 220 of the record, and also on page 223 of the record, she indicated that she wishes to remain in the United States. All of those, being married to a United States citizen, having a pending visa application, which means that she would be able to, again, reenter the United States. But all that evidence that you've just articulated, evidence is her intent, perhaps, to stay in the United States, but how does that shed any light on the defendant's desire to substantially facilitate her remaining here when the record, as far as I can tell, shows the only contact between Cuevas-Reyes and this woman is him getting her on a plane out of the country? Yes, Your Honor. Well, in this particular instance, Mr. Chavez-Reyes was contacted by Ms. Novas-Apata. He indicated to her that he could arrange this flight, which he did. He arranged the flight. He contacted the pilot, made arrangements to fly these individuals out. Now, when Ms. Novas-Apata arrived at the airport, there's testimony from Officer Santiago that the proper procedure was for her to go to the southern end of the airport, check in with customs, and then go to the northern ramp where the plane was, and then she would be able to board. By not taking Ms. Novas-Apata to the southern end of the airport, where Customs and Border Protection is, and checking her in, that facilitated her stay in the United States. Actually, it helped her get the heck out of the country in short order, because if she had gone there, she would have been detained post-haste. And she would have remained in the United States as a properly deemed illegal immigrant. Which is correct, Your Honor. She would have been arrested, and she would have been detained, and she would have been administratively processed. However... And she'd probably still be in the United States. That is correct. Now she's gone. That's correct. She has been deported to Santo Domingo. It's a weird case, because we're almost fighting about, or arguing about, the defendants helping them not get properly prosecuted. I mean, really, that's what it seems to come down to. You and your brother across the aisle disagree about Northgate, Southgate, but irrespective of that, what this defendant did was he helped these people not get caught. He helped some individuals not get caught. There were some individuals, I believe two, who stated that they were going to Santo Domingo to stay. However, in terms of Ms. Nova Zapata, who was married to a United States citizen, and whose reason for going back to the Dominican Republic was to complete her visa application... She also said, I don't have the appendix in front of me, but I've read it. She also said she wanted to move to Santo Domingo, and her papers were... But she had no papers there either. That is correct, Your Honor. How was she going to validate her status there, or here, without any papers? Your Honor, her intent, from what I understand through her testimony, her intent was to go back to Santo Domingo to complete this visa application so she can come back. Her husband, who was a U.S. citizen, had applied to change her status because of his citizenship. So you're saying that aiding someone in an effort to return at some indefinite point in the future is helping them remain? That is one of the government's arguments, Your Honor. Better phrased, it sounds like you're helping her at some future date become legal. That is correct. He was helping her at a future date become legal. The query whether she ever gets released from the Dominican Republic... It just seems so speculative. It's hard. It's an interesting question, but I think you have a terrible uphill battle to fight in light of OSCILIC. Because OSCILIC, we had an INS officer, right? That is correct. Telling someone to lay low. I'm not sure we got it right in OSCILIC, but this panel can't reverse OSCILIC. I understand that, Your Honor. However, in this particular instance, in OSCILIC, all the CBP officers stated was to lay low, don't go back to where you were living. That's basically it. This individual... And the implication is if you lay low and you don't go to that address that the government has, that I know the government has on file, you might not get caught, and you might get to stay here for another ten years. That's a pretty strong implication. That is correct. And this court, not this panel, but this court said that's not enough. What's wrong with the theory that they were shielding and helping her remain during that period of time that she was departing by telling her not to go to the appropriate terminal at Clear Customs, but to go directly to the airplane? Well, the government agrees with that, of course, Your Honor. Yeah, but do you see any weakness in that theory? Excuse me? Is there any problem from the government's point of view of that theory prevailing that during that period of time that she was trying to depart, she was remaining, of course, during that period of time? And that by directing her to avoid going through Customs, they were shielding her? That is correct, Your Honor. That was our theory, that they were shielding her by preventing, by not allowing her to go through Customs, and during that time frame, between the time that she should have gone through Customs and the time that she got on the plane to take off, there was a shielding and that she was remaining in the United States during that time. Do you have any problem with the theory that, you know, I've read all the cases that have been cited here, and there's nothing in the statute whatsoever that says anything about remaining in the United States? That is correct. That is through case law. So why aren't all of those statements remaining, which interpret the statute as remaining, why aren't they dicta? Because a plain reading of the statute says nothing about remaining. It just says shield, harbor, and so forth, and that's it. I do believe that they are dicta. How can they be dicta if we reversed the conviction from failure with insufficient evidence of remaining? That's my question. There was, or really did reverse the conviction in terms of the shielding of the Turkish student, I believe, Your Honor. However, if you read the… Can be dubbed as dicta in requiring remaining. Unfortunately, I do not believe so, Your Honor. I do not believe so. But however, what the court, the court cannot reverse Horzelik, but however, what they can do is also extend situations such as this to the definition of facilitating the remaining in the United States. Reason being is that the difference between the immigration patterns in the Fifth Circuit and the immigration patterns here in the Caribbean. The immigration patterns in the Fifth Circuit and the border states are basically trafficking on foot, on road, and when they arrive in the United States, they remain in the United States, and they send money back. There's a more transient illegal immigration pattern here in the Virgin Islands. What people do is that they come in illegally through boats and other means, sometimes charter planes, and that they remain here, they work, but they also go back to their respective islands more often than they do in the United States. There's a more give and take. There's a more, they leave more. They come here to work, and they also leave the territory more often than the aliens do that are in the continental United States. So therefore, the court could extend the facilitating the remaining, the facilitating the remaining of the alien in the United States to also include this particular fact frame. That's a very interesting argument, and that dovetails into a question I was going to ask you anyway, which is should we remand the case? The district court never had the opportunity to properly analyze the case because the district court could not have foreseen what we were, exactly what we were going to say in Ossolick. So would the government favor a remand, asking the district court to apply the test that was articulated after this case was decided? No, Your Honor. The government would prefer a firmness of the record, I mean, a firmness of the decision because of the testimony from Nova Zabata stating that her intention was to return in the United States. Well, what if we're leaning against your position? Would you then favor a remand? I mean, I guess my point is if we're not comfortable that this decision can be reconciled with Ossolick, what's the right answer? Is the right answer just to rule in favor of Mr. Cuevas-Reyes or is the right answer to send it back and give the district court first crack at it and make a record? Because the argument you just raised, maybe the government would attempt to make a record that the way illegal immigration is done here, there's a pattern and a practice and perhaps that might allow you to carry your burden of proof regarding that fourth factor. Well, in terms of reversal or remand, of course the government would prefer a remand, Your Honor. But do you think a factual record could be made on the fourth factor? I guess what I'm asking is prudence usually dictates that we give the trial courts first crack at it. We are a reviewing court. We don't make findings. Yes, Your Honor. But I don't want to, if we were to go that way and I have no idea whether we are, we haven't conferenced a case. But if we were to go that way, I wouldn't want to send you on a fool's errand having you make a record when you all say, well, what are we doing here? We can't make a record. Can you tell us how you might make a record as to that fourth factor? Well, Your Honor, it would be quite difficult to make a record in terms of the fourth factor. Reason being from the testimony elicited at the first trial would have to be used. Particularly because all of the four women have been deported back to the Dominican Republic. We do not know what their location in the Dominican Republic are. Your witnesses are gone. You couldn't retry it. Precisely. There would be an issue of paroling them back into the United States for this trial. That wouldn't be worth the time and expense, really, right? I believe so, yes, Your Honor. Okay, that's helpful. Thank you. Your Honor. Thank you. If I may, I just wanted to address two questions real quick. First, Judge Cohen, if I may. You asked the question as to if, in fact, Mr. DeGioia, who was raised, instructed these women to go to the north or the sub-ramp and avoid Customs and Border Protection, is it not shielding? And my answer is no. Because even taking that as true, which the record does not support that because the record basically shows that they were directed just only where to go at the airport to board the plane. But if we take that as true, even that facilitates them leaving the United States because by avoiding going through Customs and whatnot, if they went through Customs, they would have been detained and whatnot, and subsequently they're here. But by avoiding going through Customs and whatnot, they get to board the plane and they get to leave the United States. And that was the whole purpose of that venture on that day. So I submit even under the question that you asked, they basically were facilitated on leaving the United States. I agree that they were facilitated on leaving. But to the extent they directed them to go directly to the airplane and not go to the way they should have gone, through Customs, they were, what can be said, that for that period of time, they were remaining in the United States. They were remaining while they were deported. The way I see it, it basically comes to the same thing and amounts to the same thing because here they have them down at this end of the airport and so forth. They haven't gone to Customs and whatnot, but ultimately it's just to board the plane and leave the United States. I don't know if I'm expressing myself. You are. I understand your position. Now with respect to your question about remand, I think that even if we don't have ASNIC, if ASNIC doesn't exist, I think that at minimum reading the statute, the very reading of the statute, there had to have been some evidence of shielding or harboring these illegal aliens. Now we don't have that. The only thing that the trial court could point to was the mere fact that apparently there was some effort or someone instructed the four illegal aliens to not say that you paid any money. And that doesn't go to shielding or what I said to the trial court as being trying to hide these individuals from law enforcement authorities. So I don't know. So I think that even if we don't have ASNIC, if ASNIC didn't come about and whatnot, I think under the letters of the statute that the evidence wasn't sufficient to sustain a conviction. And now with respect to the government's argument about ultimately by allowing these individuals to leave the United States undetected, that they could somehow or sometime in the future return because they don't have this stamp showing that they were imported or whatnot, I think that would require, that's an impermissible inference. I think that it would require... It's a pretty logical inference though with respect to the woman who's married to the citizen. There's some real logic there. She's not getting out of the country because she doesn't want to be here. She's getting out of the country because she needs to do something in her country of origin to help her stay here the rest of her life. That's logical from Paul's point of view, but this is not something that is imputed to Mr. Cuevas-Reyes. He merely... If we take the testimony of the witnesses or whatnot, these different witnesses at one time or the other came and they paid monies to Mr. Cuevas-Reyes and in turn this money went to the pilot. And that's the extent of their involvement with these individuals. And in exchange, they were going to be provided transportation. Who was the broker? Where's the broker in all this? Who's the crooked broker? Well, I don't know who you term as the broker. I guess if you had to term somebody as being a broker, perhaps my guy would be the broker because he was collecting the monies. But did your client solicit and get the monies directly from the travelers or was that at least two of these women paid the monies to my client but the monies were ultimately paid to the other defendant, the pilot of the aircraft. And the testimony was that just before Agent Santiago approached and asked them to depart from the aircraft, there was an effort and so forth to return the money that the pilot handed the money back to Mr. Cuevas-Reyes and Mr. Cuevas-Reyes handed it back to the passengers of the aircraft. Thank you very much. The case was very well argued and we will take it under advisement. Thank you. And I'm distressed to learn that Mr. Lawrence, Mr. Winter, is not going to be with us. And we are, the editorial we, are investigating to find out whether he deigned to call anyone. Apparently, he has the flu. And more than that, I cannot say. But you came from Washington for this? Unfortunately. Unfortunately, I don't really get this. Well, you had to listen to us all day. If we'd known for sure he wasn't coming, we would have released you earlier. I hope you can get back or enjoy St. Croix for a while. I don't know what to do. But, we've agreed to decide the case on the papers. So, if you'd like to give us your deathless prose, you can do it. But we could decide the case even without it, I think. Is that a fair statement? I'd be happy to answer any questions. Should I go up here? No, no, no. I'd be happy to answer any questions for the court. No, I think not. We had that once when an attorney from Washington did not show up. She agreed that you could hear the other side of the case even without her. We thought that was rather an interesting thing to agree to. We heard it, and she won anyway. But anyway, I hope you have a good trip back wherever it takes place, and we'll take the case as it's submitted. Thank you.